## KILE & MORGAN CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2434.

Circuit Court of Appeals, First Circuit.
June 5, 1930.

Percy W. Gardner, of Providence, R. I., for petitioner.

Harvey R. Gamble, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

This appeal from the Board of Tax Appeals involves the single question whether the Kile & Morgan Company, a Rhode Island corporation, organized in 1903, and the Kiboling Company, a voluntary trust organized in Rhode Island January 15, 1917, are entitled to be regarded as affiliated, within the meaning of the tax statutes, for the years 1924 and 1925 and for the first two months of 1926.

The Kile & Morgan Company has been engaged in the lumber business since 1903. Its president is Berton E. Kile; its secretary and treasurer Mortimer H. Alling. Kile and Alling, owning 99 per cent. of the capital stock of the corporation, and M. G. Atkin, their bookkeeper, owning the other one-half of 1 per cent. constitute the board of directors. The Kiboling Company was organized by Kile and Alling, and held, cleared, and developed farms, on about 6,000 acres of their cut-over timber land in Arkansas. Since its organization, it has been taxed as though a corporation under the Federal Income Tax Law.

The Kiboling Company owed Kile and their corporation, during the years in question, as follows:

| | | | B. E. Kile. | Kile & Morgan Co. |
|---|---|---|---|---|
| Jan. | 1, 1924, | | $162,230.00 | $25,000.00 |
| Jan. | 1, 1925, | | 171,747.67 | 25,000.00 |
| Jan. | 1, 1926, | | 181,999.53 | 26,685.83 |
| March | 1, 1926, | | 181,999.53 | 30,000.00 |

The voting shares of the Kiboling Company for the period in question were 1,810, of which Kile owned 1,483 shares and Alling 173 shares, a total of 1,656, 91½ per cent. of the entire issue. Of the balance, 17 shares had been given by Kile as a Christmas present to his sister, Mrs. Thomas J. Boston, whose husband, Thomas J. Boston, owned 137 shares, and was employed as local manager in charge of the Kiboling property. Thomas J. Boston was indebted to the Kiboling Company, on January 1, 1924, to the amount of $2,822.-67; January 1, 1925, $3,822.77; January 1, 1926, $4,054.22; and March 1, 1926, $4,020.-96. Under G. L. of Rhode Island (1923) c. 349, § 14, Boston's stock in the Kiboling Company was subject to attachment for the

collection of his indebtedness to the trust. Under the trust agreement, no holder of Kiboling shares has the right to sell them without first offering them to the trustees. In the years 1919–1923, inclusive, these concerns were taxed as affiliated companies.

The applicable statute is section 240(c) of the Revenue Acts of 1924, 43 Stat. 253, 288, and 1926, 44 Stat. 9, 46 (26 USCA § 993(c), which reads as follows:

"For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns at least 95 per centum of the voting stock of the other or others, or (2) if at least 95 per centum of the voting stock of two or more corporations is owned by the same interests."

The question presented is whether at least 95 per cent. of the voting stock of these two concerns *"is owned by the same interests."* The Board held that the holdings of the Bostons, husband and wife, in the Kiboling Company, amounting to 8.5 per cent., made this provision of the statute inapplicable. We think this is plainly inconsistent with the prior holdings of the Board and with the weight of pertinent court decisions. It ignores the outstanding and dominant fact that these companies were essentially, and in every practical business sense, the concerns of Kile and Alling. They not only owned 99½ per cent. of the stock of their corporation, but they furnished nearly $200,000 of capital for the Kiboling Company. Of course the shares of the voluntary trust represent only the equity above indebtedness. The facts disclosed in this record make it at least doubtful whether the shares of the Kiboling Company had during the years in question any market value; for its indebtedness increased from $187,230, on January 1, 1924, to $211,999.53, on March 1, 1926. It is expressly stipulated that the company was unable to finance the operations of clearing the land and preparing it for farming, and that therefore these expenses had to be borne by Kile and the Kile & Morgan Company. Moreover, Boston, the manager, was increasingly indebted to the trust, and his 137 shares were subject to attachment and execution for payment of his indebtedness. Kile and Alling were the sole trustees of the Kiboling Company; the two concerns occupied the same office, were managed and controlled by the same individuals, Kile and Alling; at every meeting the stock held by the Bostons were voted with the stock of Kile and Alling; their shares were in effect under option to the trustees, as they must first offer them to the trustees.

In a word, the minority interests, if of any value at all, were negligible. In a practical, business, and financial sense, Kile and Alling owned and controlled both concerns; and they had both through the debts of the trust to them and the debts of Boston to the trust, as well as through relationship of Boston and his wife, effective control of the Kiboling Company. The two concerns constituted an economic unit.

Turning now to the statute, we think it was properly construed by the Board of Tax Appeals in Hagerstown Shoe & Legging Co., 1 B. T. A. 666, 672, where the Board stated as follows:

"Are we, in applying this statute, to look at the tabulated statement of stock ownership and, because it there appears that several persons are stockholders of one or the other legal entity and not of both, say that this alone is determinative? We have had occasion in other appeals on other questions to say, and we can not too often repeat, *that all facts must be considered.* These problems are not flat *mathematical or legalistic puzzles;* they are vital, and *must be examined in three dimensions with the light of reality. No solution otherwise arrived at could long survive.* Here the table of percentages changes its color entirely in the light of the circumstances under which the percentage distribution exists, and, instead of indicating a substantial independent minority, indicates that 'substantially all the stock of two * * * corporations is owned or controlled by the same interests.'"

In Rishell Phonograph Co., 2 B. T. A. 229, 233, the Board pertinently said:

"If 'the same interests' was intended to mean only 'the same persons,' it would have been easy for Congress, by using the latter term, to have avoided all ambiguity. * * * If two individuals hold all the stock in two corporations, but in different proportions, their respective interests may be divergent or identical."

The same general doctrine is also laid down in Germantown Braid Co., 3 B. T. A. 1336; Appeal of Jordan Marsh Co. and Avon Street Trust, 3 B. T. A. 553; Century Music Publishing Co. v. Commissioner, 12 B. T. A. 647; Appeal of Midland Refining Co., 2 B. T. A. 292; Appeal of Kolynos Co., 4 B. T. A. 520.

It is true that up to November 12, 1927, the applicable regulation of the Treasury Department was inconsistent with the decisions of the Board. It read:

"The words 'the same interests' shall be deemed to mean the same individual, partnership or corporation, but when the stock of two or more corporations is owned by two or more individuals, by two or more partnerships or by two or more corporations, the corporations will not be held to be affiliated unless the percentage of stock of such corporations held by each individual, each partnership, or each corporation is substantially the same in each of the corporations."

But the Board, in numerous decisions, held to the contrary, and we think rightly. This resulted in a change in the regulation, so that article 633 read as follows:

"When corporations are affiliated. Two or more domestic corporations will be deemed to be affiliated (a) if one corporation owns at least 95 per cent. of the voting stock of the other or others, or (b) if at least 95 per cent. of the voting stock of two or more corporations is owned by the same interests."

It follows that the regulation as it existed at the time of the taxes now in question must be held invalid, as unreasonable.

It is possible that the courts have differed in their interpretation of the phrase "the same interests." See Judge Morton's opinion in Goldstein Amusement Co. v. White (D. C.) 33 F.(2d) 787. But we find no case which, fairly analyzed, supports the decision of the Board in this case.

In Commissioner v. Adolph Hirsch & Co., 30 F.(2d) 645 (C. C. A. 2), the Hirsch brothers owned 94.85 per cent. in one corporation, but only 55.63 per cent. of the other company. This large minority interest in the other company was held to prevent the application of the statute.

In Ice Service Co. v. Commissioner, 30 F.(2d) 230 (C. C. A. 2), there was a large minority interest in one of the companies seeking affiliation of 32 per cent. owned by some two hundred owners. These cases are easily distinguishable, on the facts, from the case at bar.

The Great Lakes Case (Great Lakes Hotel Co. v. Commissioner, 30 F.(2d) 1 (C. C. A. 7th), gives a much broader and more liberal interpretation of the phrase "the same interests" than we need give in this case to warrant sustaining the appeal.

Counsel for the Commissioner now set up the contention that there is no sufficient evidence that the taxes assessed were more than if on a consolidated basis; it is enough to say that this is the fair inference from the record, including the opinion of the Board

of Tax Appeals. We decline to accept this highly technical method of disposing of the petition to this court.

Our conclusion is that the financial, family, and blood relations—all three—made the minority interest in this case negligible, and that the decision of the Board of Tax Appeals must be reversed.

The decision of the Board of Tax Appeals is reversed, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.