**J. ROGERS FLANNERY & CO. v. COMMISSIONER OF INTERNAL REVENUE.**

**FLANNERY BOLT CO. v. SAME.**

**VANADIUM METALS CO. v. SAME.**

**Nos. 4338-4340.**

Circuit Court of Appeals, Third Circuit.

July 21, 1930.

Kenneth N. Parkinson and David A. Pine, both of Washington, D. C. (J. Rogers Flannery, of Pittsburgh, Pa., of counsel), for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before BUFFINGTON and DAVIS, Circuit Judges, and JOHNSON, District Judge.

BUFFINGTON, Circuit Judge.

This tax case involves the construction and application to its facts of section 240(a) of the Revenue Act of 1918 (40 Stat. 1081), which provides "that corporations which are affiliated within the meaning of this section shall * * * make a consolidated return of net income and invested capital," and section 240 (b), 40 Stat. 1082, which provides, "For the purposes of this section two or more domestic corporations shall be deemed to be affiliated * * * if substantially all the stock of two or more corporations is owned or controlled by the same interests."

When this bill was up for passage, there was practical unanimity in the Senate as to what the law had in view. Senator Simmons, Chairman of the Committee on Finance, said: "The Committee recommends its adoption * * * because the principle of taxing as a business unit what in reality is a business unit is sound and equitable." And Senator

Penrose, ranking minority member, said: "It is impossible to determine the true profits of such a combined enterprise except by treating the enterprise as a unit and disregarding the incidental placing of different branches in legally separate corporations."

Treating the enterprise as a "business unit," as suggested by one lawmaker, and the adoption of the unit idea by the other and his "disregarding the incidental placing of different branches in legally separate corporations," commends itself to us as a happy statement of purpose of the law and as furnishing the guide to its application. The lawmakers evidently saw the status of the taxpayer was one that could not be individually defined, but where broad, inclusive words such as "affiliated," "substantially," "stock * · * controlled," "by the same interests," should be used. In order, therefore, to ascertain whether the corporations here concerned were "affiliated," we inquire whether the facts make the case one where "substantially all the stock of two or more corporations is owned or controlled by the same interests." We note here there is no dispute as to the facts and the issue involved is one of law, to wit, the inference to be drawn from the pertinent facts, which are so well marshaled in the taxpayers' brief we quote them in extenso:

"In 1904, a group of friends and business associates, presided over by James J. Flannery and Joseph M. Flannery, brothers, and J. Rogers Flannery, son of James J. Flannery, organized The Flannery Bolt Company, a corporation, under the laws of Pennsylvania, for the purpose of acquiring the patent rights to the Tate Staybolt and for manufacturing and selling the bolt.

"This Staybolt was designed to relieve a need in the locomotive industry in that theretofore the bolt supporting the upper and lower portions of the water compartment of a locomotive was rigid, with the result that expansion and contraction resulting from heating frequently either broke the bolt or pulled it from its socket, cracking the boiler plate and damaging the boiler materially.

"In order to insure a widespread interest among locomotive manufacturers and railroad companies, certain key men in those and allied industries, friends of the Flannerys widely scattered throughout the country, were invited to and did become stockholders, each individual being permitted to acquire but a few shares of stock and only upon the personal invitation of one of the Flannerys. A block of stock was set aside for the principal employees of the Flannery Bolt Company

upon preferential terms, thus stimulating their interest, the selection thereof and financial arrangements therefor being handled by James J. Flannery, who was elected president of the company. Others of the original group served as officers and directors.

"From the beginning of this company, James J. Flannery was looked upon as the guiding genius. He was the most important man in the organization up to the date of his death March 6, 1920. While consulting his associates freely, he nevertheless determined every policy of the company. Directors' meetings were held regularly but consisted mostly of ratifying the acts and recommendations of James J. Flannery. In the selection of employees to occupy principal positions, etc., James J. Flannery consulted no one and these employees reported to and received instructions from him alone. Written contracts for the erection of buildings, etc., were considered by him unnecessary, such work in all instances being placed in the hands of a contractor in whom James J. Flannery had absolute confidence. Flannery determined and supervised every policy and act of the company from the beginning until his death, receiving always the complete support of his associates and stockholders. With but minor exceptions, stockholders never attended the annual meetings, but returned proxies to James J. Flannery or some one designated by him, such proxies being prepared by him or under his direction, designating in advance the substitute. No reports of any nature were ever submitted to stockholders.

"In 1905, the Flannery group which founded the Flannery Bolt Company became interested in and acquired vanadium properties in Peru, and in 1906, organized the American Vanadium Company, a corporation, under the laws of New Jersey, for the purpose of mining and smelting vanadium, which is an alloy for mixture with steel and other metals.

"The officers and directors of the Flannery Bolt Company became the officers and directors of the American Vanadium Company with James J. Flannery as president. A factory was erected adjoining the plant of the Flannery Bolt Company and on the property of the Bolt Company, thus enabling the joint use of facilities, men and equipment. The offices of the company were maintained together, using joint space, equipment and men. The stockholders of the Bolt Company were invited by the Flannerys to become stockholders of the American Vanadium Company and practically without exception

took advantage of the opportunity, and in addition, individuals occupying key positions in the locomotive and steel industries, who had been unable to acquire stock in the Bolt Company, were invited to and did become stockholders either in their own names or in the names of members of their immediate families in the American Vanadium Company with the same restriction as to amount, etc. The same policy as to the management and conduct of affairs as in the Bolt Company was pursued by James J. Flannery in the American Vanadium Company and with equal force and effect.

"With the formation of the Flannery Bolt Company and the American Vanadium Company, the dominating group set out on a program of expansion. From these two companies all other companies mentioned hereinafter were organized with the object either of fostering the greater use of vanadium and of/or fostering some line of development closely allied to the Staybolt or of increasing the sales of either or both. Always in the development of these later organizations the three Flannerys stood out as the controlling factor, but over all stood out the personality and leadership of James J. Flannery.

"The remaining companies were organized as follows:

"(1) The Keystone Nut Lock Manufacturing Company, a corporation, was organized in 1907 under the laws of New Jersey, by the same group which founded the Flannery Bolt and American Vanadium Companies for the purpose of manufacturing and selling nut locks for use on locomotives. The manufacture of this nut lock was done by and in the Flannery Bolt Company plant. Sales were handled by J. Rogers Flannery & Company hereinafter referred to.

"(2) From 1906 to 1908, J. Rogers Flannery served as sales manager of the Flannery Bolt Company. In 1908 he secured from that company an exclusive selling contract for the life of the Tate Bolt patents on the basis of a set commission per bolt, irrespective of the selling price. Upon receipt of this contract he incorporated J. Rogers Flannery & Company and assigned his selling contract, in consideration of its capital stock. A portion of this stock he issued to employees without consideration in order to stimulate their selling activities. A portion was presented as a gift to his father and his wife. The balance he retained. He was president of this company. Its vice-president was also vice-president and general manager of the Flannery Bolt Company. Advertising, etc., was pre-pared and distributed by the Bolt Company at the expense of J. Rogers Flannery & Company.

"(3) The Vanadium Metals Company, a corporation, was organized in 1909 under the law of New Jersey. This company was formed to manufacture bronze products using vanadium as an alloy with other materials. The moving spirit behind the organization of this company was J. Rogers Flannery. The executive, selling, accounting and purchasing offices of this company were located in the general offices of the Flannery interests. As in the other companies the same small group of men who founded the Flannery Bolt and American Vanadium Companies were the dominant factors. Again the same stockholders of the Flannery Bolt Company and the American Vanadium Company together with other key men were invited to and most of them did become stockholders in the new company. Since the very purpose of the organization of this company was to expand the use of vanadium, all of its vanadium was purchased from the American Vanadium Company.

"(4) The Vanadium Chemical Company, a corporation, was organized in 1910 under the laws of Delaware. This company was organized for the purpose of manufacturing and selling vanadium compounds for medicinal and pharmaceutical purposes, the American rights to which had been acquired by Joseph M. Flannery. This company also acquired from James J. and Joseph M. Flannery certain hotel properties operated as a sanatorium in connection with the use of curative vanadium compounds. Its capital stock was owned by those invited to become such, the same as was the case in the prior companies organized.

"(5) The Collier Land Company, a corporation, was organized in 1910, under the laws of Pennsylvania, as a holding company of the real estate of all the different corporations comprising the Flannery interests, and for the further purpose of erecting an office building in which all of the companies might maintain their offices, etc. In addition it erected houses adjacent to the Flannery Bolt and the American Vanadium Companies' plants for sale or rent to the employees of these or the other Flannery companies. With the exception of qualifying shares all of its capital stock was owned by the Flannery Bolt and American Vanadium Companies during the years in question and in almost equal proportions.

14

"(6) The Electro Vanadium Reduction Company, a corporation, was organized in 1914, under the laws of Delaware for the purpose of using vanadium in babbitt and other bearing metals. The operations of this company were carried on in the factories of the Flannery Bolt Company and financed by the Vanadium Metals Company.

"Prior to the erection of the Flannery Building in 1912, all of the companies composing the Flannery group occupied joint offices in the Frick Building, Pittsburgh. Subsequent to the erection of the Flannery Building by the Collier Land Company, all the companies occupied joint offices in that building, such an arrangement serving to facilitate convenience and at the same time enabling the common usage of employees and office facilities. All companies used a common switchboard for telephones and common telegraph instruments, contributing a flat amount to regular service. Messenger service was common to all.

"The plant of the Flannery Bolt Company was erected and in operation at the time the American Vanadium Company was formed. Upon the organization of the latter company a factory was erected by virtually extending that of the Flannery Bolt Company, upon the land of the Flannery Bolt Company. In 1914, the demands of the American Vanadium Company having increased, a new plant was erected within a distance of a few hundred feet on land owned by the Collier Land Company. The Flannery Bolt Company extended its operations to include the old plant of the American Vanadium Company. Both plants used common dining facilities, trackage, power, labor, laboratory facilities, etc. The respective plant superintendents conferred daily, and frequently the Flannery Bolt Company superintendent served as superintendent of both plants. The products of the Keystone Nut Lock Manufacturing Company and those of the Electro Vanadium Reduction Company were manufactured by the Flannery Bolt Company and all companies availed themselves of the laboratory facilities of the American Vanadium Company.

"Virtually all banking and financing of all companies was done at the same bank which occupied the first floor of the Flannery Building owned by the Collier Land Company. James J. Flannery was president of the Bank from its organization until his death and controlled its policies. The companies named as parties to these proceedings made certain loans and advances to each other on open account without interest and without security. The office employees were located in the Flannery Building, generally being assigned to space without consideration to the company with which they were officially connected and subject to call and rendering service to any and all within the group and without charge therefor except to the company or companies employing them. All companies purchased supplies through a common purchasing agent appointed by and responsible to James J. Flannery. Stationery supplies and general office equipment were used by each company and without cost other than to the American Vanadium Company and Flannery Bolt Company. Substantially the same individuals served on the various boards of directors from the beginning of the companies to and throughout the years in question resulting in uniform control and management and the utmost informality. Directors' meetings served to ratify acts already performed or determined under the direction of James J. Flannery. Stockholders' meetings were also informal and served primarily to satisfy legal requirements and to re-elect the same individuals as officers and directors. But few stockholders ever attended and they were content to rely on the judgment of the Flannerys. The remaining stockholders took no active part whatever, being content to receive their dividend checks, and, like the others, rely on the judgment of the Flannerys. No reports of any kind were submitted to or requested by the stockholders. The utmost harmony prevailed, no dissension of any kind ever having asserted itself."

Was this the case of a "business unit"? In doing business every one of these legally separated companies co-operated with all the others in the unitary operation of such business. Every share of stock of each company was engaged in the work, policy, and profit making of the unitary business controlled by the Flannery interests. It was a business unum e pluribus, for while the companies were "pluribus" in name, they were "unum" in aim, operation, and business success. Every company contributed toward the unitary success of the whole. The successive corporate units were from time to time created, not as an end in themselves, but as a further aid in carrying on an additional part of the expanding business unit. In other words, as Senator Penrose so tersely and clearly said, it was a carrying out of "the enterprise as a unit and disregarding the incidental placing of different branches in legally separate corporations."

So far as the stockholders of all the co-operating corporations were concerned, there was complete business harmony. There was no insistence by any stockholder on his legal rights as a shareholder, but a complete surrender of such rights to the absolute control of the interests or personnel that dominated and did the work, made the profits, and paid the dividends. Moreover, there was complete economic unity. No stock was sold to the public; all supplies were bought by a common buyer; intercorporation loans were made by company to company without security. The work of every company was done from a common building. Without referring to other co-operating and interlocking and coasting working elements, we are satisfied that these companies were truly affiliated companies. Indeed, it is hard to picture any state of facts more within the broad comprehensive and inclusive terms of the act or that so fully measured up to the purpose the lawmakers had in view when they framed it. So holding, the decree of the tax board must be vacated, and the companies allowed to make a consolidated return of net income and invested capital.