**PEAVY–WILSON LUMBER CO. v. COMMISSIONER OF INTERNAL REVENUE, and Eleven Other Cases.**

Nos. 6084–6092, 6158–6160.

Circuit Court of Appeals, Fifth Circuit.

June 30, 1931.

Motion for Amendment of Opinion Denied July 28, 1931.

S. L. Herold and John B. Files, both of Shreveport, La. (S. P. Cousin, of Shreveport, La., on the brief), for petitioners in Nos. 6084 to 6092, inclusive, and for respondents in Nos. 6158 to 6160, inclusive.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key, John MacC. Hudson, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel., Bureau Internal Revenue, Percy S. Crewe, Sp. Atty., Bureau Internal Revenue, both of Washington, D. C., for respondent in Nos. 6084 to 6092, inclusive, and for petitioner in Nos. 6158 to 6160, inclusive.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

These are petitions in two sets, one by three corporations and the other by the Commissioner of Internal Revenue, to review a decision of the Board of Tax Appeals reported in 14 B. T. A. 625. The corporations complain because the board, in arriving at the amounts of income and profit taxes payable by them during all or a part of the period covered by the taxable years 1916 to 1922, adopted November 20, 1909, the date of a timber contract referred to below, as the date upon which the timber described in that contract should be included as invested capital, under the provisions of Revenue Acts which provide for the valuation of tangible property at the time of its acquisition. They contend that the board should have ascertained the value of the timber as of July 28, 1913, the date on which one of them, the Peavy-Byrnes Lumber Company, exchanged half of its capital stock, less one share, for the interest of the other party to the contract. The importance of this contention lies in the fact that the timber had so increased in value as that what remained of it on July 28, 1913, was worth considerably more than the timber that was on the land at the date of the contract, notwithstanding that in the meantime much of it had been cut and converted into lumber. The adoption by the board of the earlier of the above-named dates resulted in an increase of the amounts found to be due as income taxes during the taxable years in question over the amounts that would be payable if the later is the correct

date for ascertaining the value of the timber as invested capital.

On November 20, 1909, the Krause & Managan Lumber Company, as party of the first part, and the Peavy-Byrnes Lumber Company, as party of the second part, entered into the contract above mentioned. The first paragraph of that contract purports on its face to effect a sale by the party of the first part to the party of the second part of all merchantable pine timber, measuring 12 inches or over in diameter at the stump, on certain described lands. The second paragraph obligates the party of the second part to pay $4 per thousand feet as the timber is cut, of which it was to retain $1 to retire an indebtedness of $100,000, secured by a second mortgage executed by the party of the second part on the land and timber. In other paragraphs the party of the second part agreed to build a sawmill, and to cut annually twenty million feet of timber. The party of the first part obligated itself to pay the taxes on the timber as well as the land, and reserved the right at its option to revoke the contract upon the failure of the party of the second part, without legal cause, to operate the sawmill continuously for as long a period as six months. It was agreed, finally, that the party of the second part, when it had received out of the net profits of its business a sum equal to its total original investment, should pay to the party of the first part half of all subsequent net profits, and should transfer a half interest in all its assets, or half of its capital stock, less one share, to the party of the first part, at the latter's option. The Peavy-Byrnes Company complied with all its obligations. It had received, by July 28, 1913, from net earnings an amount equal to its total investment, including all loans and advances it had made to the Krause & Managan Company; and on that date the latter company exercised its option and received in exchange for its half interest in future earnings the stock of the Peavy-Byrnes Company to which it was entitled.

▆▆▆ The interest of the Krause & Managan Company in the timber was tangible property within the meaning of the Revenue Acts. See Revenue Acts of 1918 and of 1921, § 325 (a), 40 Stat. 1091, 42 Stat. 273. There is no contention that actual value was not paid in for the stock. Section 326 (a) of the Revenue Acts just referred to (40 Stat. 1092, 42 Stat. 274) allows as invested capital the cash value of tangible property at the time it is paid in or surrendered. The only question presented by this branch of these cases is: What is the date upon which the value of such property should be ascertained? The board construed the contract as a sale of timber as of its date in 1909, and held that the stock issued in 1913 to the Krause & Managan Company was delivered and received in payment of the purchase price of the timber. We are of opinion that the contract did not effect an immediate sale of the timber. The first paragraph of it was indeed couched in the language of a sale; but other paragraphs placed upon the Krause & Managan Company the burden of paying taxes, conferred upon it the contingent right of revocation, and retained for it a half interest in all the assets of the Peavy-Byrnes Company, including a half interest in net profits accruing after the latter company had received back its original investment in the sawmill, and all loans and advances. The obligations to pay the taxes and the amount secured by the second mortgage are such as are usually assumed by the owner, and only an owner could assert the right to terminate the contract. Prior to July 28, 1913, the Peavy-Byrnes Company had only the right to cut the timber, and that right was subject to revocation upon its default in the operation of the sawmill. If during the life of the contract the timber had been destroyed by fire or otherwise, the loss of it would have fallen on the Krause & Managan Company. The Peavy-Byrnes Company did not become the owner of the timber until July 28, 1913, when it paid for it in stock. The Krause & Managan Company upon the exercise of its option to take the stock surrendered its interest in the contract, and thereafter became only a stockholder. It therefore cannot be held, as argued on behalf of the Peavy-Byrnes Company and the other two petitioning corporations, that the stock was issued to the Krause & Managan Company only for the purpose of evidencing its right to continue to receive half of the future net profits. We are of opinion that the board erred in failing to accept July 28, 1913, as the date for ascertaining the value of the timber received by the Peavy-Byrnes Company in exchange for its capital stock.

The commissioner assigns error on a finding of the board to the effect that during the taxable years the three corporations were affiliated within the meaning of applicable Revenue Acts, and were therefore entitled to make consolidated returns.

Of the three corporations, the Peavy-Byrnes was organized in November, 1909; the Peavy-Wilson in December, 1916; and the Peavy-Moore in August, 1919. Each operated a sawmill and cut timber off of separate tracts of land, but in disposing of the lumber they were operated as a business unit. They had the same executive offices, practically the same officers, directors, and salesmen. A. J. Peavy was president of each company, and he directed and controlled their business affairs. Fifteen stockholders and members of their families owned in 1919 of the total stock of the three corporations, 94.10 per cent. of the Peavy-Byrnes, 79.72 per cent. of the Peavy-Wilson, and 69.90 per cent. of the Peavy-Moore. The stock owned by employees increased these percentages to 94.65 per cent. of the Peavy-Byrnes, 83.31 per cent. of the Peavy-Wilson, and 85.51 per cent. of the Peavy-Moore. The employees owned outright the stock standing in their names, but they were enabled to purchase it through the financial assistance of Peavy.

The variations in stock ownership during the other years need not be stated, as they were so slight as to be negligible. The remaining stock of each company was practically all owned by business partners of one or more of the principal stockholders, or by officers or directors of banks which were depositories of the funds of the corporations. Some of the principal stockholders, including Peavy, were officers or directors of these banks. The principal stockholders voted from 95 to 100 per cent. of the stock represented at stockholders' meetings. The board found that Peavy and his associates exercised actual control and domination of all three corporations. Nor is it to be doubted that they exercised actual control of substantially all the stock.

The Revenue Act of 1918 provides by section 240(a) that corporations which are affiliated shall make a consolidated return; and section 240(b) reads: "For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests." 40 Stat. 1081, 1082. The Revenue Act of 1921 by section 240(a) permits, but does not require, affiliated corporations to make a consolidated return; and its section 240(c) is the same as section 240(b)

above quoted from the 1918 Act. 42 Stat. 260. The 1921 act also by section 1331 repeats the above definition of affiliated corporations, and provides that the Revenue Act of 1917 shall be deemed to impose taxes upon the basis of consolidated returns in the case of domestic corporations that were affiliated during that year. 42 Stat. 319. The commissioner contends that the control meant by the above section 240 (b) (2) is a legally enforceable control. He is supported in that position by the following cases decided by the Circuit Court of Appeals for the Second Circuit: Ice Service Co. v. Commissioner, 30 F.(2d) 230; Commissioner v. Hirch, 30 F.(2d) 645, and Handy & Harman v. Commissioner, 47 F.(2d) 184, now pending in the Supreme Court on certiorari, 51 S. Ct. 353, 75 L. Ed. ——; Commissioner v. Gong Bell Mfg. Co., 48 F.(2d) 205. To the same effect is United States v. Cleveland, 42 F.(2d) 413, decided by the Circuit Court of Appeals for the Sixth Circuit. Actual control, whether legally enforceable or not, has been held sufficient in the First, Third, Fifth, Seventh, and Ninth Circuits, and by the Court of Claims. Kile v. Commissioner, 41 F.(2d) 925; Flannery v. Commissioner, 42 F.(2d) 11; Pelican Ice Co. v. Commissioner, 37 F. (2d) 285, 286; Great Lakes Hotel Co. v. Commissioner, 30 F.(2d) 1; Commissioner v. Richfield Co., 42 F.(2d) 360; Burnet v. Wilshire Oil Co., 46 F.(2d) 975; Eby Shoe Co. v. United States, 44 F.(2d) 273. Ownership of at least 95 per cent. of the voting stock is required by the Revenue Act of 1924 and later acts. 26 USCA § 993. The making of a consolidated return for 1929 or any subsequent year is treated as a privilege. 26 USCA § 2141. Control of stock, not resulting from ownership, since the effective date of the 1924 Revenue Act, is not to be considered in determining the question whether or not corporations are affiliated. But the Revenue Acts of 1918 and 1921 make control as well as ownership of stock a material factor; by the former affiliated corporations were required to file a consolidated return; under the latter they had the right to do so. In both these earlier acts control was the broader term and indicated something in addition to ownership. Corporations were to be deemed affiliated under the first subdivision of section 240(b) of the 1918 act and section 240(c) of the 1921 act where one of them owned directly or controlled through closely affiliated interests or by nominees substantially all the stock of the other or others; and under the second subdi-

vision where substantially all the stock of two or more corporations was owned or controlled by the same interests. The control of stock was used in the same sense in each subdivision, and therefore control through partners or close business associates by the same interests is to be given the same effect as control by one corporation of another through closely affiliated interests or by nominees. We are of opinion still, as stated in Pelican Ice Co. v. Commissioner, supra, that "a primary object of the statutory provision requiring corporations owned or controlled by the same interests to make a consolidated return was to prevent a single business enterprise, by splitting up its net profits and dividing them with its subsidiaries, from avoiding payment of the surtaxes imposed under the higher brackets of a graduated income tax law." It is always to be borne in mind that the Revenue Act of 1918 was passed just after the close of the World War, when the temptation was very great to escape taxation by resorting to the device of scattering among affiliated corporations the net profits of what in reality was a single business enterprise. Congress had a practical end in view, and as we think was dealing with actual as distinguished from legal control of the stock. Its purpose would have been thwarted if stockholders, owning substantially all the capital stock of several corporations, had been permitted materially to reduce their holdings by placing stock in the names of members of their families, of employees, of business associates, and of friendly banks. One who gives stock to any of these classes parts with the legal control. What constitutes substantially all the capital stock of a corporation is a material question here. Treasury Regulation 45, by Article 633 adopted pursuant to the Revenue Act of 1918, recognized that the ownership or control of 95 per cent. is sufficient, and that percentage, as already stated, has since 1924 had the approval of Congress. The principal stockholders, their families, business partners, and associates, and employees of the companies owned practically 95 per cent. of the Peavy-Byrnes Company. The percentages owned by the above classes of stockholders of the stock of the Peavy-Wilson and Peavy-Moore Companies was not substantially all of such stock. In our opinion, however, the actual control of the minority stock by Peavy and his associates justified the board in holding that the Peavy-Byrnes and Peavy-Wilson Companies were affiliated in 1917 and 1918; and that all three corpora-

tions were affiliated during the later taxable years, within the meaning of the Revenue Acts then in force.

The petitions of those corporations are, and each of them is, granted, and the causes remanded for further proceedings not inconsistent with this opinion.

The petitions of the Commissioner of Internal Revenue are, and each of them is, denied.

On Motion for Amendment of Opinion.

PER CURIAM.

The motion in behalf of petitioners for amendment of opinion in the above numbered and entitled causes is denied.