## HARMOUNT v. COMMISSIONER OF INTERNAL REVENUE.
### No. 5872.

Circuit Court of Appeals, Sixth Circuit.
May 3, 1932.

Chas. P. Taft, 2d., of Cincinnati, Ohio (Taft, Stettinius & Hollister, of Cincinnati, Ohio, on the brief), for petitioner.

J. M. Hudson, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, Wm. Earl Smith, C. M. Charest, and Robert L. Williams, all of Washington, D. C., on the brief), for respondent.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The decision sought to be reviewed is that of the United States Board of Tax Appeals sustaining a deficiency assessment by the Commissioner of Internal Revenue against the petitioner herein for income tax for the year 1920. The determination of the tax resulted from the disallowance of a deduction claimed for a bad debt against the Michigan Central Railroad Company in the amount of $21,714.30.

The deduction was claimed upon the following facts: The petitioner, a resident of Chillicothe, Ohio, was engaged in the lumber business under the name of the Harmount Tie & Lumber Company. From 1909 to 1912 he was selling cross-ties to various roads comprising the New York Central lines, including the Michigan Central Railroad Company, under contracts made with W. F. Goltra, a joint purchasing agent for the several railroads, and his successor. The debt sought to be deducted arose out of the contract for the Michigan Central Railroad Company; similar claims against other New York Central lines having been paid. Up to October,

1909, the arrangement was that the petitioner would ship ties to certain destination points on the Michigan Central from points of origin on other roads. The Michigan Central thereupon distributed the ties from the destination points to various places on its own road for use. When freight is shipped from point of origin on one road to point of destination on another, there is a through rate. The railroads have contracts with each other providing for a distribution of this through rate on some agreed percentage basis. Under the terms of sale of the crossties to the Michigan Central, that road paid the freight upon arrival of the cars, canceled the proportion covering the movement of the cars on its own lines, and deducted from the vouchers issued the petitioner for the price of the ties an amount representing the proportion of freight due to the foreign lines up to the junction point.

In October, 1909, the joint purchasing agent modified the arrangement so that ties should be consigned to the junction point of the foreign line and the Michigan Central. The latter then distributed them from the junction point to the places where they were actually used. Under this arrangement the foreign line would charge a rate to the junction point, and the Michigan Central tariff provided for a rate from the junction point to the point of destination. The sum of these rates being greater than the through rate, it was arranged that when a car arrived at its destination the through rate should govern, and the proportion which would have accrued to the foreign line if the car had been consigned directly to the point of destination should be the correct deduction. The petitioner would then make claim against the Michigan Central for the differential. The effect of this change in the arrangement was in most cases an increase in the proportion of freight accruing to the foreign lines, and a corresponding increase in the deductions from the vouchers.

Claims for the differential were filed by the petitioner during 1910 and 1911 with the various railroads, and all of them were paid with the exception of those filed against the Michigan Central, which, as figured by the petitioner, totaled the amount disallowed as a deduction after certain corrections not here in dispute were made. Sometime in 1912, or shortly thereafter, the petitioner received from Goltra copies of two vouchers totalling over $15,000, and about a year later was notified that two more vouchers for the balance had been issued. None of the vouchers were paid. The record shows a number of letters from Goltra, the joint purchasing agent, claimed to be acknowledgments of the Michigan Central's liability to the petitioner, and oral admissions by Goltra to the petitioner were also relied upon.

The petitioner's claims against the Michigan Central, not having been adjusted or paid, were placed in the hands of petitioner's attorney in Detroit in October 1913. Some of the claims were based upon alleged deductions by the railroad of the full foreign freight to the junction point without adjustment, and the remaining claims were based upon alleged incorrect adjustments. At the suggestion of the railroad, the two types of claims were separated, and it is contended that an understanding was reached by which one group of claims was to be paid, and the discussion continued concerning the other. Payment, however, was never made, and in January, 1916, the petitioner filed suit in the Michigan courts for the full amount of the claims.

Because of the vast amount of data required, the expense incident to proving the large number of shipments, and because many of the original documents had been surrendered to the Michigan Central, the petitioner and his attorney considered it necessary to secure an agreed statement of facts before proceeding to trial. Numerous conferences were held, but no agreed statement of facts resulted. The last conference was held in 1920, and in that year the petitioner was advised by his attorney that nothing further could be accomplished. The suit filed by the petitioner against the Michigan Central has never been tried.

In 1913, petitioner assigned his claims against the Michigan Central to his bank as collateral for loans. The security of the assigned claims was passed upon by the bank's board of directors, and the assignments were retained by the bank as part collateral for loans made from time to time, until in 1920 the bank advised petitioner that in its opinion the claims were worthless, and that it would be necessary to substitute for them other collateral. This was done, and finally, on December 31, 1920, petitioner charged off the claims on his books as worthless, and deducted their full amount from his 1920 income tax return as a bad debt. The respondent disallowed the deduction on the ground that the claims had become worthless prior to 1920. The Board of Tax Appeals sustained the Commissioner upon this ground, and on the added ground that there was no rela-

tion of debtor and creditor between the petitioner and the Michigan Central Railroad. The petition herein was filed to review the Board's order.

The deductions disallowed by the respondent were claimed under section 214 (a) of the Revenue Act of 1918 (40 Stat. 1066), which permits deductions for debts ascertained to be worthless and charged off within the taxable year. It is conceded that under this section the burden is on the taxpayer to show: (1) That there was an existing debt; (2) that the debt was ascertained to be worthless within the taxable year; and (3) that it was charged off the books of the taxpayer. Since it is not questioned that the account was charged off in 1920, the only issues before the Board of Tax Appeals were whether there was a debt, and whether in 1920 it was ascertained to be worthless.

The claims against the Michigan Central were first filed by the petitioner during 1910 and 1911. They were not paid. They were put into the hands of petitioner's attorney at Detroit in October, 1913. Presumably, they were vigorously pressed, but no settlement resulted. In January, 1916, to prevent their being outlawed, suit was brought upon them at Detroit. Efforts made from time to time by petitioner's counsel to have the railroad agree upon a statement of facts proved futile. There was no payment nor acknowledgment of liability. The petitioner testified, as to the point in dispute with the railroad, that the railroad objected to the method of computing freight, claimed it did not owe the money, and would not pay. There is no substantial evidence in the record to support a finding that Goltra's vouchers and admissions bound the Michigan Central. Goltra was a joint purchasing agent for the New York Central lines. Petitioner was unable to say that he had any authority to bind the company (Michigan Central), and no ratification is shown by any officer of the railroad. It is clear that the petitioner himself placed little reliance upon the claimed admissions; his suit against the railroad was never pressed, and presumably was abandoned when in 1920 he charged off the account.

■■ We are unable to say from this that the Board of Tax Appeals was wrong in its finding that the relation of debtor and creditor between the petitioner and the Michigan Central did not exist. The burden is upon the taxpayer not only to show the existence of a debt, but to overcome a presumption that the Commissioner is right, unless the record before the Board of Tax Appeals as a whole, clearly, convincingly, or even possibly, "indisputably" requires a contrary conclusion. Tracy v. Commissioner of Internal Revenue, 53 F.(2d) 575 (C. C. A. 6); Atlas Plaster & Fuel Company v. Commissioner of Internal Revenue, 55 F.(2d) 802 (C. C. A. 6).

■ Not more successful was the petitioner in showing that the claims were ascertained to be worthless in the taxable year. The claims had been under discussion with the Michigan Central for ten years before they were written off. For seven years they had been in the hands of an attorney, and for four years they had been in suit. During all that time the railroad had denied liability, and had questioned the method of computation. The petitioner must have known for a long time that if not the whole account, at least a substantial part of it was worthless. The only new circumstances that came to his notice in 1920 were the refusal of the bank to longer carry the claims as collateral, and the advice of his counsel that nothing further could be done about them. Under all the facts, the exercise of reasonable business judgment might well have anticipated these circumstances long before they occurred.

Another element in the situation must be noted as bearing upon ascertainment of worthlessness. There is no contention that the Michigan Central was insolvent; in fact its solvency is, in argument, conceded. It is difficult to conceive of circumstances under which a debt of more than $21,000 against a solvent debtor can become worthless. The more reasonable inference to be drawn from the facts is either that the debt was worthless from the beginning, or that it was not properly to be considered a "debt," but rather a hoped for addition to income which was subsequently unrealized. Lewellyn v. Electric Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262; Wadsworth Manufacturing Co. v. Commissioner, 44 F.(2d) 762 (C. C. A. 6). The petitioner's explanation for the charge off of the account is that it would have cost more to collect than could be realized, and that documents necessary to proof were in possession of the adverse party. We find it unnecessary to decide whether the cost of collecting a debt warrants an ascertainment of its worthlessness; the taxpayer having the right to deduct such expense from current income. Nor do we determine whether mere difficulty of proof justifies a similar ascertainment, since no showing is here made of the probable costs of suit, and no claim is made that production of documents could not

be compelled by subpoena. Moreover, the circumstances upon which the explanation is based were known for a long time prior to 1920. If they led to an ascertainment of the worthlessness of the debt they were no more persuasive in that respect in 1920 than they were before. The burden being where it is, and the requirements of proof as indicated, we are unable to say that the Board was wrong in failing to find that the claims were ascertained to be worthless in 1920.

Finally, attention is called to Treasury Regulation 45, promulgated January 28, 1921. Article 151 of the regulation deals with bad debts, and, among other provisions, contains the following: "In the case of debts existing prior to March 1st, 1913, only their value on that date may be deducted upon subsequently ascertaining them to be worthless."

No question is raised as to the applicability of this regulation, nor the authority of the Commissioner to promulgate it. The debts sought to be deducted by the petitioner, if they had any valid existence at all, arose in 1910 and 1911. No proof is made as to their value in 1913, and, whether deduction is claimed as a bad debt or as a loss, such proof is not excused by impossibility of making it. Burnet v. Houston, 283 U. S. 223, 51 S. Ct. 413, 75 L. Ed. 991.

The order of the Board of Tax Appeals is affirmed.