**TUNNEL R. R. OF ST. LOUIS v. COMMISSIONER OF INTERNAL REVENUE.***

**ST. LOUIS BRIDGE CO. v. SAME.**

**TERMINAL R. R. ASS'N OF ST. LOUIS. v. SAME.**

Nos. 8803–8806, 9194, 9257.

Circuit Court of Appeals, Eighth Circuit.

Sept. 9, 1932.

S. Mayner Wallace and T. M. Pierce, both of St. Louis, Mo. (Fred Esch, of Washington, D. C., on the brief), for petitioners.

G. A. Youngquist, Asst. Atty. Gen. (J. Louis Monarch and Morton K. Rothschild,

*Rehearing denied November 9, 1932.

Sp. Assts. to Attorney General, and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. A. Norman, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

These are six petitions to review decisions of the Board of Tax Appeals in six separate appeals to that Board from the decision of the Commissioner of Internal Revenue. The cases were consolidated for the purpose of hearing before the Board of Tax Appeals, and were decided in two opinions. The cases are here presented on separate records, but have been consolidated for the purpose of the appeal, so that the petitioners have filed one brief in support of all the petitions and respondent has filed one brief in opposition.

The petitioners are the Tunnel Railroad of St. Louis, St. Louis Bridge Company, and Terminal Railroad Association of St. Louis, all corporations. The taxes involved are those for the years 1920, 1921, and 1922. The Terminal Railroad Association of St. Louis (hereinafter called the Terminal Company) owns the railroad terminals at St. Louis and East St. Louis. The Tunnel Railroad of St. Louis (hereinafter called the Tunnel Company) owns the tunnel under the city of St. Louis and the St. Louis Bridge Company (hereinafter called the Bridge Company) owns the connecting Eads Bridge across the Mississippi river. The Bridge Company and the Tunnel Company were incorporated on December 18, 1878, for a period of five hundred years. The properties of these two companies on July 1, 1881, were leased to the Wabash, St. Louis & Pacific Railway Company and the Missouri Pacific Railway Company for their entire corporate existence and any renewals or extension thereof. In 1889 the lease above referred to was assigned to the Terminal Railroad Association of St. Louis. The Terminal Company operates the terminal and transfer facilities as a unit, and the properties leased by it from the Tunnel Company and the Bridge Company are an indispensable part of such terminal facilities, and could not be practicably operated separately.

The facts are not in dispute. The petitioners assign error in the decisions of the Board of Tax Appeals in the following particulars:

(1) That the Board of Tax Appeals erred in finding and deciding that the petitioners the Tunnel Railroad of St. Louis and the St. Louis Bridge Company were not affiliated with the Terminal Railroad Association of St. Louis, a corporation, for income tax purposes for the years 1920, 1921, and 1922, within the meaning of section 240 of the Revenue Acts of 1918 and 1921 (40 Stat. 1081; 42 Stat. 260).

(2) That the Board of Tax Appeals erred in finding and ruling that the petitioner's (Terminal Railroad Association of St. Louis) deduction for maintenance during the year of 1920 should be reduced in the sum of $150,-000, representing an amount alleged to have been paid in 1922 by the Director General of Railroads to the petitioner for undermaintenance during the period of the federal control of railroads.

(3) That the Board of Tax Appeals erred in finding and ruling that the amounts paid by petitioner (Terminal Railroad Association of St. Louis) in 1920 and 1922 as fines for violations of the Federal Safety Appliance Acts (45 USCA § 1 et seq.) and the Twenty-Eight Hour Live Stock Acts (45 USCA § 71 et seq.) were not allowable as deductions from petitioner's taxable income.

(4) That the Board of Tax Appeals erred in finding and ruling that depreciation suffered by the petitioner (Terminal Railroad Association of St. Louis) in 1920 and 1922 upon the Eads Bridge and its approaches, and upon the tunnels and subways in connection therewith, all of which were operated by petitioner as part of its terminals, was not allowable to petitioner as deduction from its taxable income.

(5) That the Board of Tax Appeals erred in finding and deciding that for 1922 petitioner was not entitled to deduct from its taxable income its loss in the sum of $306,620.69 arising out of the retirement of the capital stock of Interstate Car Transfer Company, a corporation.

The same order as presented by the parties in their briefs with reference to the errors assigned may be followed herein, and may be discussed under the following titles:

(1) Affiliation; (2) Undermaintenance; (3) Fines; (4) Depreciation; (5) Loss in re: Interstate Car Transfer Company.

## I. Affiliation.

Tunnel Railroad of St. Louis (Nos. 8803, 8805); St. Louis Bridge Co. (Nos. 8804, 8806); Terminal Railroad Association of St. Louis (Nos. 9194, 9257).

It is the contention of the petitioners that they are entitled to file a consolidated re-

turn under section 240 of the Revenue Acts of 1918 and 1921, this law being paragraphs (b) and (c) respectively of said section 240, reading as follows: "For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

There is no claim by the petitioners that any one of them in fact owns or controls substantially all the stock of either of the other two, or that the same interests own or control substantially all the stock of the petitioners. They contend, however, that, in view of the unusual circumstances presented by the undisputed facts herein, the Terminal Company owns and controls in legal effect all the stock of the Bridge and Tunnel Companies within the meaning of the act.

The lease of the properties of the Bridge Company and the Tunnel Company provides that, as a rental, the lessee is to pay the principal and interest as the same comes due on the $5,000,000 bonds of the Bridge Company, and that a stated amount per share as dividends shall be paid to the holders of the $2,490,000 of first preferred stock of the Bridge Company, and to the holders of the $3,000,000 second preferred stock of that company. Likewise a stated amount per share as dividends is to be paid to the holders of the $1,250,000 of the Tunnel Company stock. It is further provided that all taxes and assessments of whatsoever nature imposed upon the corporate properties, franchises, or earnings of the lessor companies shall be paid by the lessee. The lease also provided that the sum of $2,500 shall be paid in each year of the lease term for the defraying of expenses incurred by lessors in making reports to the government, publishing notices, and other matters required by law. The lessee agreed to provide an office for the use of the lessor companies in the city of St. Louis, and to pay the necessary expenses to maintain a fiscal agency in the city of New York. All the properties leased were required to be kept in a good state of repair. All the common stock of the Bridge Company, which is about one-third of the voting stock of that corporation, was by the terms of the lease turned over to the lessee. The lease also contained this provision: "That in case of default by said lessee companies in any of the matters or things herein contained or provided for, and the con-

tinuance of such default for sixty days, the said lessor companies shall have the right to enter upon all and singular the premises hereby demised and the same to repossess and enjoy in the same manner as if these presents had not been made."

The various classes and amounts of stock of the Bridge Company which were outstanding in 1920, 1921, and 1922 are as follows: First preferred stock, 6 per cent. dividend rate—$2,490,000; second preferred stock, 3 per cent. dividend rate—$3,000,000; common stock, no dividend rate specified—$2,500,000.

Each of the above classes of stock had equal voting rights. The Tunnel Company had outstanding stock during the years 1920, 1921, and 1922 of the par value of $1,250,000. The par value of the outstanding stock of the Bridge Company and the Tunnel Company was $100 per share. The Terminal Company did not own any of the first and second preferred stock of the Bridge Company during the years in question. All this stock during said time was owned by the general public. The rights of the Terminal Company in and to the common stock were derived by it under the terms of the lease herein referred to. All the stock of the Tunnel Company during this period was owned and held by the general public. No part thereof was owned by the Terminal Company. Neither the Bridge Company nor the Tunnel Company owned any of the stock of the Terminal Company during these years. It appears from the stipulation of facts that the officers of the Terminal Company held the same respective positions in the Bridge Company and Tunnel Company to which they were elected annually by individuals who are officers of the three petitioners. A majority of the voting stock of both the Bridge and Tunnel companies was voted with the aid of proxies, annually, by some individual or individuals acting jointly for all three of the petitioners.

The Board of Tax Appeals in its opinion denying the affiliation held: "The test laid down by the statute for affiliation, however, is control of the stock by the same or closely affiliated interests. This test is not met in this case."

The petitioners admit that the facts do not establish control of the stock of the Bridge and Tunnel companies by the Terminal Company, but it is urged that this is an exceptional case, which comes within the spirit of, if not the letter, of the statute; that to all intent and purposes the Bridge and Tunnel Companies are mere "corporate shells" with the control of all their assets in the Terminal

Company. It is contended that the interests of the stockholders in the Bridge and Tunnel Companies is confined to a fixed guaranteed dividend which is paid directly by the Terminal Company. The petitioners point out that, in order to secure substantial equality as between the stockholders, an affiliated return would be required, and it is contended that the one interest of the stockholders of the Bridge and Tunnel Companies is to obtain a fixed dividend, and any loss to the business of such companies will be sustained by the stockholders of the Terminal Company, and the profits over and above the stipulated rental will be received by the stockholders of the Terminal Company.

The contention of the petitioners indicates a failure to analyze the undisputed facts with reference to the construction of the statute in question. The Tunnel and Bridge Companies are lessors. The burden of the leasehold is paid by the lessee in various ways. A portion of the rents represents a guaranteed dividend to the stockholders. It must be quite evident, however, that there is no community of interests, as contemplated by the statute in question, with respect to profits and losses as between the stockholders of the lessors and the stockholders of the lessee. In times of financial depression as well as during prosperous periods, the stockholders of the lessors can require the guaranteed dividend. In the event of the failure of the lessee to comply with the provisions of the lease for a period of sixty days, the lessors may repossess and take over the entire properties for the benefit of its stockholders. One must not lose sight of the fact that, after all, the relationship that exists between the lessors and the lessee is that of landlord and tenant. It may be conceded that, as long as a lease is in existence, the Terminal Company controls the entire properties of the lessors, and the stockholders are relegated to the status of mere bondholders. This relationship, however, is not markedly different from the situation that exists between the stockholders of a corporate lessor and the stockholders of a corporate lessee in any long-time lease. Any lease where the lessor is to receive a certain yearly rental with the lessee assuming all of the obligations for the upkeep of the property, including taxes, will result in a fixed return to the stockholders of the lessor without further functioning on their part from year to year during the time that the lease is in existence; but, however one may analyze the relationship that exists between these stockholders, it is very clear that the petitioners have not met the statutory test for affiliation. The decision of Handy & Harman v. Burnet, 284 U. S. 136, 52 S. Ct. 51, 52, 76 L. Ed. 207, has set at rest various conflicting judicial opinions as to what constitutes affiliation. The court stated:

"The section requires control of substantially all of the stock; control of the corporations is not enough. The carrying on of a business unit by two or more corporations does not in itself constitute affiliation. * * *

"The purpose of section 240 was, by means of consolidated returns, to require taxes to be levied according to the true net income and invested capital resulting from and employed in a single business enterprise even though it was conducted by means of more than one corporation. Subsection (b) clearly reflects the intention, by means of such returns, to secure substantial equality as between shareholders who ultimately bear the burden. That intention is shown by the legislative history and was given effect by the regulations contemporaneously promulgated. It requires no discussion to show that such returns will not make against inequality or evasion unless the same interests are the beneficial owners in like proportions of substantially all of the stock of each of such corporations. Alameda Investment Co. v. McLaughlin (D. C.) 28 F. (2d) 81; Montana Mercantile Co. v. Rasmusson (D. C.) 28 F. (2d) 916; Commissioner v. Adolph Hirsch & Co. (C. C. A.) 30 F. (2d) 645, 646; Commissioner of Internal Revenue v. City Button Works (C. C. A.) 49 F. (2d) 705. Affiliation on any other basis would not make against inequality or evasion. It would require very plain language to show that Congress intended to permit consolidated returns to depend on a basis so indefinite and uncertain as control of stock without title, beneficial ownership or legal means to enforce it. Control resting solely on acquiescence, the exigencies of business or other considerations having no binding force is not sufficient to satisfy the statute."

All the first and second preferred stock of the Bridge Company and all the stock of the Tunnel Company was owned by others than the Terminal Company. The latter company controlled less than one-third of the voting stock of the Bridge Company. None of the stock of the Terminal Company is owned by the Bridge Company or the Tunnel Company. The present dormancy of the stock control by the stockholders of the Bridge and Tunnel Companies would soon be revived and its vitality evidenced in the event the Terminal Company failed to comply with the terms of the lease. Assume for instance that the Ter-

minal Company should become insolvent. The so-called community of interests among the stockholders would soon vanish. Petitioners endeavor to obtain some comfort in the language of the Handy & Harman Case wherein the court refers to "beneficial owners and beneficial ownership." Suffice it to say that the relation herein will not justify the finding that the Terminal Company is the beneficial owner of the stock of the two other companies. Control over the lessor's physical assets, even though such assets are an integral part of its business, does not affect the stock ownership. One cannot resort to the fiction contended for by petitioners and find that the control of assets is a substantial ownership and control of the stock of the lessor companies. It is evident that nothing less than ownership or legal control of substantially all the stock satisfies the statute. In this case, the stock control still remains with the respective stockholders. Control of the voting power by proxy does not benefit petitioners' position. See United States v. Cleveland, P. & E. R. Co. (C. C. A.) 42 F.(2d) 413.

The Supreme Court has, in several instances, handed down per curiam reversals on the authority of the Handy & Harman Case. In Howes Bros. Hide Co. v. Commissioner, 49 F.(2d) 878, the Circuit Court of Appeals vacated the decision of the Board of Tax Appeals and held that the control of the three corporations in that case was in the same interests and allowed a consolidated return. On page 880 of 49 F.(2d) is found the following language: "Unquestionably, the Howes brothers are the dominant, managerial, and economic power of the three concerns. In common phrase, the Huntington Company and the hide company are subsidiaries of the Howes Brothers Company. The three concerns are a business unit. * * * It follows that, in a practical, financial, and business sense, the same interests controlled this corporation."

Certiorari was granted and the decree was reversed, the court merely referring to the Handy & Harman Case. Peavy-Wilson Lumber Co. v. Commissioner (C. C. A.) 51 F.(2d) 163, was likewise reversed by the Supreme Court in a per curiam opinion on April 18, 1932. Burnet v. Peavy-Wilson Lumber Co., 286 U. S. 524, 52 S. Ct. 494, 76 L. Ed. 1267. In J. Rogers Flannery & Co. v. Commissioner (C. C. A.) 42 F.(2d) 11, it appeared that a group of companies constituted a business unit, and therefore a consolidated return was allowed. In this case the court stated on page

14 of 42 F.(2d): "Every share of stock of each company was engaged in the work, policy, and profit making of the unitary business controlled by the Flannery interests."

Apparently, the only question that the Supreme Court was concerned with when certiorari was granted was to determine whether or not the Flannery interests did own or legally control substantially all the stock of the affiliated companies. In that this fact did not appear, the case was reversed in a per curiam decision on April 18, 1932. Burnet v. J. Rogers Flannery & Co., 286 U. S. 524, 52 S. Ct. 497, 76 L. Ed. 1268.

The decision of the Board of Tax Appeals on the question of affiliation is therefore affirmed.

## II. Undermaintenance.

### Terminal Railroad Association of St. Louis (No. 9194).

The Terminal Company, in computing its tax for the year 1920, deducted certain moneys expended by it for maintenance of its properties. The only question presented in this review is whether the facts justify the Board's reduction of $150,000 from the amount so deducted.

After possession of the railroads was relinquished by the government on March 1, 1920, the Terminal Company and its admitted affiliated companies filed with the Director General of Railroads various claims for amounts alleged to be due them as the result of the federal control of the railroads. The claims asserted totaled more than $800,000. Included in this sum was a claim by the Terminal Company for $150,000 based on an alleged undermaintenance of its properties during the time such properties were in the possession of the government. The Director General, however, contended that the Terminal Company owed the government some $175,000 for overmaintenance, and asserted the properties as returned to the petitioner were in a better condition than when taken over by the government. The Terminal Company and the Director General had correspondence with one another looking towards some adjustment. On February 3, 1922, the President of the petitioner wrote the Director General complaining of the management during the period of federal control, and criticized certain expenditures of funds in making improvements on the properties of the petitioner which he contended would not bring an adequate return to the railroads, and, with reference to the disputed claims that one was making against the other, he stated:

"Finally, under these circumstances, we cannot accept the proposal to pay the Administration $175,000.00 additional, as the amount you are asking us to pay could only be met through a draft on the proprietary interests, which is impossible now as all of the lines have more obligations themselves, the outgrowth of similar circumstances, than they can meet, and it would be the height of folly to call on them to share our burden. In order to close the matter I propose to wipe the slate and assume your obligation to settle with the City on the Municipal bridge claim amounting to $62,000.00, and on the 14th street viaduct claim amounting to $175,-000.00, which latter is subject to further increase as the City has now decided to make the new viaduct 80 feet wide and this will increase the cost 33⅓ per cent."

The letter, however, did not bring about any adjustment of their differences. In April, 1922, the Terminal Company repeated its former proposal to "wipe the slate clean," and it was this suggestion that "was accepted by the Director General." It was agreed that the office of the Director General would prepare the necessary papers evidencing a final settlement of their differences. Shortly thereafter the Terminal Company received from that office three proposed forms of settlement. One recited payment to the Terminal Company of $60,000 in settlement of its claims against the government. The second recited payment of $145,-000 in settlement of claims of some of the allied companies of the petitioner against the government. The third recited payment of $205,000 to the St. Louis Merchants' Bridge Terminal Railway Company (an affiliated concern) in settlement of its claims against the government. The president of the Terminal Company, upon receiving the proposed forms of settlement, protested to the Director General that the documents that were received containing the proposed forms of agreement were not in accordance with the settlement arrived at "whereby all claims were to be withdrawn by both parties." The Terminal Company was assured, however, by the Director General that this "was a matter of accounting, and necessary to permit him to close his books." Upon receiving that assurance, the Terminal Company apparently agreed to adopt the Director General's suggestion, in that it was held out to be a mere matter of form and a plan whereby the Director General would be able to balance his accounts. Checks were sent to the petitioner aggregating $205,000. One check was for $60,000 payable to the order of the Terminal Company, and the other check was in the amount of $145,000, and payable to the Wiggins Ferry Company, an associated concern. The two checks of the Director General for $60,000 and $145,000 were indorsed to the order of the St. Louis Merchants' Bridge Terminal Railway Company, and by that company the checks were indorsed to the Director General and returned to him. No money was received by the Terminal Company or its associated companies. The checks simply passed through their hands, and were returned to the Director General. No other pertinent facts appear in the record as to the details of the settlement.

During the period from March 1, 1920, to December 31, 1920, the Terminal Company and the St. Louis Merchants' Bridge Terminal Railway Company expended $913,-980.33 and $627,209.56, respectively, for the maintenance of their properties. In determining the taxable income of the Terminal Company and its affiliates, the Commissioner reduced the claimed deduction for maintenance, and found, as the result of this settlement, there had been paid or allowed the Terminal Company $193,765, and to the St. Louis Merchants' Bridge Terminal Railway Company the sum of $18,377.77, or a total of $212,142.77, to reimburse these companies for expenses necessary to overcome undermaintenance of their properties on February 29, 1920. The claimed deduction of the Terminal Company and its affiliates was reduced in said amount. The Board of Tax Appeals held that the Commissioner was in error in reducing the maintenance expense in the amount of $212,142.77, and recognized that in arriving at that figure the Commissioner had credited the government with some $62,000 more than the original amount claimed by the Terminal Company as against the Director General for undermaintenance, and therefore the Board determined that the sum of $150,000 of the adjustment should be allocated to undermaintenance, and concluded that that sum instead of $212,142.77 should be deducted.

It appears that the Commissioner determined that, when the properties were restored by the Director General on March 1, 1920, they were undermaintained, and from March 1, 1920, to December 31, 1920, the Commissioner found that the petitioner had expended over a million dollars for the maintenance of said properties. He apparently was of the opinion that a part of this sum expended for maintenance was to overcome

the undermaintenance of the properties during government control, and that a part was due to normal maintenance. Therefore the portion of undermaintenance due to federal control which was reimbursed by the Director General he concluded should be deducted from the maintenance expense for the year 1920; that is, to the extent that the petitioner was reimbursed by the Director General for undermaintenance, no expenses for undermaintenance were incurred by it.

Assuming that a portion of this undermaintenance arose under federal control, we find no fault with the reasons of the Commissioner as to the necessity of reducing the maintenance expense from March 1, 1920, to December 31, 1920, if it can be determined from the evidence that a portion of such expenditures has been indemnified by the Director General. The Board concluded that, as the Terminal Company in its original claim as presented to the Director General had asked for an allowance of $150,000 for undermaintenance, in the settlement such sum had been received by it. We are not unmindful that the Board's conclusion on this question, if supported by substantial evidence, cannot be disturbed,—Ames v. Commissioner (C. C. A.) 49 F.(2d) 853; Conklin-Zonne-Loomis Co. v. Commissioner (C. C. A.) 29 F.(2d) 698; Franciscus Realty Company v. Commissioner (C. C. A.) 39 F. (2d) 583—but a careful reading of the record convinces us that the conclusion of the Board in regard thereto cannot be sustained.

The Terminal Company was pressing a claim for over $800,000. Included in this sum was $150,000 for undermaintenance. The Board of Tax Appeals found that the claim presented over and above the $150,000 was not without merit. The Director General did not recognize the validity of any portion of the claim for undermaintenance. He contended that the roads were overmaintained, and insisted that a balance of $175,000 was due the government from the Terminal Company. The parties settled their differences by simply withdrawing their respective claims, and it amounted to a waiver of all claims against each other. The indorsement of the checks by the petitioner and its affiliates and the return thereof to the Director General tends to strengthen petitioner's position that the procedure was merely a bookkeeping transaction. The Director General may have contemplated that under the law he was obligated to make good to the Terminal Company any undermaintenance that may have occurred while the properties were under federal control, and deemed that these ex parte bookkeeping transactions would foreclose the petitioner from making any future claim against the government for undermaintenance. A withdrawal of petitioner's claim for undermaintenance may have justified such procedure from the government's viewpoint, but it should not militate against petitioner's contention that no indemnification or compensation had been received by it in reduction of the amount it admittedly spent for undermaintenance.

Furthermore, it must be borne in mind that the entire claim of $800,000 was adjusted by whatever arrangement was made between the Director General and the Terminal Company in the settlement of 1922. The Board, in referring to the claims and counterclaims between the parties, said: "The nature of several items of the claims was such that there could be no exact measurement. The negotiations terminated in an understanding that each should waive any claim upon the other." The undermaintenance claim cannot be preferred to the claims aggregating $650,000, which is the balance of the claims advanced by the Terminal Company that were considered in arriving at a settlement. No presumption can be indulged in that the $150,000 claim was liquidated and the balance was not. When the parties agreed to "wipe the slate clean," it is evident that no allocation can be held to have been made with respect to any claim or any portion of the claim. The Director General simply withdrew his claim for $175,000, and the Terminal Company withdrew its claim for $800,000. No income, credit, or money passed from one to the other. At the time of the agreement, it is admitted that the parties did not attempt to allocate any portion of the settlement simply because the parties realized that the adjustment they had agreed upon was merely a withdrawal of claims. It is sheer guesswork to say that a final adjustment withdrawing their respective claims liquidated any certain claim or claims that were presented by the Terminal Company to the Director General.

It is quite apparent that the whole confusion has arisen on account of the arbitrary entries made by the Director General in balancing his books. As an indication thereof, it is only necessary to mention that he allocated to the St. Louis Merchants' Bridge Terminal Railway Company (an affiliate of the petitioner) some $18,000 for undermaintenance when no claim had been presented

by that concern for undermaintenance, and the Director General had maintained throughout the entire negotiations that all the properties of the petitioner were heavily overmaintained. The books of the Director General were the basis of the Commissioner's conclusions. It is quite evident that the Commissioner did not in his discretion take it upon himself to make any distribution of the so-called settlement. He followed the books of the Director General in face of the undisputed facts that the Director General had admitted that the book entries were merely his own allocation in order to balance his books, and that the settlement as it appears on his books was not made in accordance with the agreement to withdraw claims. The Board found that "the evidence shows that after an agreement had been reached between your petitioner and subsidiaries and the Director General for settlement of their claims by each party withdrawing its demands on the other, the officers of the petitioner requested information of the allocation made on the books of the Director General. Such information was refused." The Board determined that, in that the entries in these books had not been made until after the settlement had been agreed upon, the books were incompetent as evidence. Manifestly, the Board was correct in this ruling. These books were not competent as evidence of any fact or agreement that was consummated by this settlement. They merely represented the opinion of some individual in the Director General's office.

Respondent cites the well-recognized rule that, in absence of the application by either debtor or creditor of a payment made by the debtor to the creditor prior to the time the payment became the subject of litigation, the court may make the application in accordance with its views of fairness and equity. But such a principle has no application herein, where the terms of the agreement indicate that neither party intended that a settlement should result in any credit or payment upon the claims of the other. Here we have only a mutual release of claims. We are bound to consider the adjustment between the Terminal Company and the Director General as it was agreed upon. We are not at liberty to substitute a different agreement. The whole difficulty with the Board's conclusion rests on the mistaken theory that there is any basis for holding that a portion of the undermaintenance expended by the petitioner in 1920 was made good to the petitioner

as the result of this settlement. The Board proceeded upon the presumption that a payment was actually made to the petitioner, and it was thereby reimbursed in part for its undermaintenance expense. It must be apparent, however, that a withdrawal of claims, one as against the other, does not result in any sum or credit passing to the respective parties.

It is with some hesitation that we disturb the Board's conclusions on a finding of fact. This is not, however, a determination of disputed testimony; nor is it a finding as to the weight of the evidence. The Board has merely indulged in a fiction that a partial recoupment has resulted to the petitioner of the sum it has spent for undermaintenance. The theory is apparently due to the original erroneous consideration of the Director General's books. We are clear that it is not possible to attribute this adjustment between the petitioner and the Director General as a liquidation or payment of any item or items in the claims made by the petitioner. The conclusions of the Board are in our opinion unwarranted.

In accordance with the views herein expressed, the decision of the Board of Tax Appeals with reference to the deduction of $150,000 from the amount that petitioner spent for undermaintenance is reversed.

### III. Fines.

Terminal Railroad Association of St. Louis
(Nos. 9194, 9257).

The Terminal Company and its affiliates were required to pay as a penalty for violation of the Safety Appliance Acts and the Twenty-Eight Hour Live Stock Acts the sum of $3,083.28 and the sum of $5,926.20, respectively, for the years 1920 and 1922. The Terminal Company and its affiliates claimed as deduction the amount so paid as penalties from its taxable income in the years 1920 and 1922. These deductions were disallowed. This question has been directly passed upon by this court in the case of Great Northern Railway Company v. Commissioner, 40 F.(2d) 372, on page 373, in which this court said: "The other item, amounting to $4,587.02, represents penalties paid during the year 1917 by the appellant for violation of federal statutes or regulations. This amount appellant sought to deduct as an ordinary operating expense. The disallowance thereof by the Commissioner and the sustaining of such disallowance is the matter in dispute here. The character

of these expenditures is such that they should not be regarded as coming within the statutory definition of deductible operating expenses. It is true that they arose in connection with the operation of the road, but it is also true that they arose entirely from unlawful operation, prohibited specifically by statutes or regulations. It cannot be that Congress intended the carrier should have any advantage, directly or indirectly, or any reduction, directly or indirectly, of these penalties."

We adhere to the views expressed in the above case, and the disallowance of said deductions is affirmed.

## IV. Depreciation.

### Terminal Railroad Association of St. Louis (Nos. 9194, 9257).

The Terminal Company seeks to deduct from its income for the year 1920 $183,833.-29, and as a deduction from its income for the year 1922 the sum of $200,000.36. It is contended that the said sums represent alleged depreciation on the "Eads Bridge and approaches." It also claimed as a deduction from its income for the year 1920 $18,-731.70, and for the year 1922 the sum of $22,477.84, representing alleged depreciation on "Tunnels and Subways." The Commissioner first agreed with the contention of petitioner and allowed specific sums for such deduction, but later reversed himself because the alleged depreciated properties were not owned nor paid for by the Terminal Company. The Board of Tax Appeals concurred in the Commissioner's final conclusion.

The properties in question are held under a five hundred year lease, referred to herein in more detail under the subheading "Affiliation." The lease is in full force and effect. The Terminal Company has made expenditures for repairs, taxes, and other expenses in connection with the properties in accordance with the provisions of the lease, and such expenditures have been deducted from its income for the years 1920 and 1922, and have been allowed. The Revenue Acts of 1918 and 1921 each provide in section 234 (a) (7) that, in computing the net income of corporations, there shall be allowed as a deduction "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." 40 Stat. 1077; 42 Stat. 254. The petitioner recognizes that generally, in a case of property

that has been leased, depreciation is allowed only to the lessor, but it contends that, under the facts herein, it is in reality the owner of the property in question. It may be that, to all practical purposes, the petitioner is the owner, but no portion of the capital investment of the Eads Bridge and approaches and the Tunnels and Subways has been paid for by the petitioner. Its only relationship to these properties is to be found in the terms of the lease. The petitioner is the lessee, and has made no capital investment in any of these properties. In light of the decisions, it would seem that the only question is whether or not any capital of the lessee has gone into the depreciated properties that it has leased from the lessor companies.

In Weiss v. Wiener, 279 U. S. 333, 49 S. Ct. 337, 73 L. Ed. 720, the Supreme Court held that such a deduction was not allowable to a lessee, notwithstanding covenants to replace the property, for the reason that the loss in such case was not a realized loss. In that case the Court said (page 336 of 279 U. S., 49 S. Ct. 337, 338): "But it is very clear that as yet the capital of the lessee has not gone into it, and upon the considerations just mentioned it is not enough that he has made a contract that very possibly may not be carried out to replace that capital at some future time. If, as we think, such a contract is not enough to cause the lessee a present loss by wear and tear, the fact, which may be assumed, that the property was used by him in his business, does not matter. Of course he must show an interest in the property and a present loss to him to make the statute apply."

In Belt R. Co. v. Commissioner, 59 App. D. C. 137, 36 F.(2d) 541, page 542, certiorari denied, 281 U. S. 742, 50 S. Ct. 348, 74 L. Ed. 1155, in which it was held that the lessee of terminal railway facilities without capital investment in the company was not entitled to a deduction for depreciation, the court said: "The deduction which appellant company here seeks is a sum set aside as a reserve for the exhaustion of property which, under its lease, it was required to replace. It must be remembered that appellant company had no capital investment whatever in any of the leased property. It was the property of the Indiana Company and remained such under the terms of the lease. Wear and tear and depreciation of the property would not exhaust any capital investment made by the appellant company.

Having no capital investment in the property, it is not entitled to any deduction."

See, also, United States v. Ludey, 274 U. S. 295, 300, 47 S. Ct. 608, 71 L. Ed. 1054; Duffy v. Central R. Co., 268 U. S. 55, 45 S. Ct. 429, 69 L. Ed. 846.

The depreciation of the property leased by the Terminal Company does not exhaust any capital investment which it has made. So far as it is concerned, maintenance, depreciation, and obsolescence are a part of the expenses of business operation. The conclusion of the Board in regard to the item of depreciation is correct, and is hereby affirmed.

### V. Loss in Re: Interstate Car Transfer Company.

#### Terminal Railroad Association of St. Louis (No. 9257).

The entire issue of stock of the Interstate Car Transfer Company was acquired by the Terminal Company for the sum of $675,000 prior to March 1, 1913. The Interstate Company owned the ferry which operated across the Mississippi river at St. Louis, and was in competition with the Eads Bridge. The ferry service was suspended in 1914 because of the construction of a levee on the east side of the river. The levee was not completed until 1921. In 1922 the capital stock of the Interstate Company was reduced from $500,000 par value to $5,000, leaving the Terminal Company with 50 shares instead of 5,000 shares. In consideration for the cancellation of these shares, the Interstate Company gave the Terminal Company $366.67 in cash, assigned to it an account due from one of its affiliated companies amounting to $15,000, and canceled an account due it from the Terminal Company in the sum of $293,705. The transaction resulted in the payment of $309,071.67 to the Terminal Company upon the retirement of 99% of the stock of the Interstate Company. The Terminal Company claimed a loss of $378,912.50 on account of this transaction, but has now reduced its claim to the sum of $306,620.69, and, on account of the loss that it contends it sustained in the retirement of its capital stock, the Terminal Company claims the right to deduct the latter amount in computing its taxes for the year 1922. This claim was disallowed by the Board of Tax Appeals on the ground that there was no evidence as to the value of the stock in question as of March 1, 1913. The only evidence offered of the March 1, 1913, value was a comparative balance sheet drawn from the books of the Interstate Company. The parties had stipulated that the comparative balance sheet might be received in evidence, but, after that stipulation, for some reason that is not apparent, the petitioner objected to the introduction of this evidence on the grounds that it was incompetent, irrelevant, and immaterial. The Board did not pass upon the objection at that time, but reserved its ruling, and the following statement is found in the Board's opinion with reference thereto:

"At the time of the hearing both parties agreed that a ruling upon the objections appearing in the stipulation should properly be reserved until the Board came to consider the case upon its merits and the parties had an opportunity to file their briefs. The objection which we now have under consideration was only one of several appearing in the stipulation. Facts relative to the history of the company and as to its profits and losses in the years prior to March 1, 1913, and as to its assets on that date are undoubtedly material and relevant in this proceeding for the purpose of proving the value of the stock of the company on March 1, 1913. A bare statement that books of account show certain asset values or certain profits and losses, standing by itself without any evidence that the books were kept in the ordinary course of business or accurately reflected the assets, liabilities, profits and losses of the business can scarcely be deemed competent to prove the value of the assets or the amount of the liabilities or the gains or losses of the business. This is especially so in a case such as we have here where other entries quoted from the books establish that such books were not kept in a manner which would accurately reflect such items. We are accordingly of the opinion that the objection to the competency of such book entries must be sustained except where the stipulation is to the effect that the facts are as shown in such entries. The effect of the ruling is to leave the record without any proof of March 1, 1913 value. It may be pertinent to state, however, that if we could assume that the facts were accurately stated in the book entries, our conclusion would be that the stock of this company had no greater value on March 1, 1913, than was realized on its redemption."

The burden of proof rested upon the petitioner to establish the March 1, 1913, value. In the case of Burnet v. Houston, 283 U. S.

223, 227, 51 S. Ct. 413, 415, 75 L. Ed. 991, the court stated: "The burden of proof to establish a deductible loss and the amount of it, clearly, was upon the respondent. Reinecke v. Spalding, 280 U. S. 227, 233, 50 S. Ct. 96, 74 L. Ed. 385; United States v. Anderson, 269 U. S. 422, 443, 46 S. Ct. 131, 70 L. Ed. 347. It was just as necessary under the statute for the respondent to prove value as of March 1, 1913, as it was to prove cost in 1906 and the amount finally received by him in 1920."

It is not necessary to go into the evidence which prompted the Board to make the ruling in question. The petitioner invited the ruling, and is not now in a position to complain. Furthermore, the Board determined that the books in many instances were not reliable. Their determination that there was no competent evidence of the March 1, 1913, value will not be disturbed by this court.

In Tracy v. Commissioner (C. C. A.) 53 F.(2d) 575, on page 579, the following pertinent language is found: "The question of the March 1, 1913, value of property is a question of fact, and a decision of this sort reached by the taxing officer or board within the scope of the authority conferred by law, when made in good faith, and in the absence of gross mistake or other irregularity, has long been held by the courts as conclusive. Cf. Hagerty v. Huddleston, Hubbard & Co., 60 Ohio St. 149, 165, 166, 53 N. E. 960. This is but another way of saying that the decision of the taxing board must prevail if it is not contrary to the 'indisputable character of the evidence' or if the evidence is 'legally sufficient to sustain' such finding. The evidence is legally sufficient to sustain the finding if there be substantial evidence to support it, and the record as a whole does not clearly, convincingly, or even possibly 'indisputably' require a contrary conclusion. This is not inconsistent with our previous decisions. Compare Cartier v. Commissioner [C. C. A], 37 F.(2d) 894; C. F. Medaris Co. v. Commissioner [C. C. A.], 38 F.(2d) 812; and Guarantee Bond & Mortgage Co. v. Commissioner [C. C. A.] 44 F.(2d) 297. Further citations seem unnecessary."

See, also, Atlas Plaster & Fuel Company v. Commissioner (C. C. A.) 55 F.(2d) 802; Harmount v. Commissioner (C. C. A.) 58 F. (2d) 118.

The decision of the Board with reference to the item of loss in re Interstate Car Transfer Company is affirmed.

*Rehearing denied November 28, 1932.